# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GARY VELORIC; MICHAEL GOODMAN; )
THE GOODMAN 2007 GRANTOR )
RETAINED ANNUITY TRUST ONE; and )
THE GOODMAN 2007 GRANTOR )
RETAINED ANNUITY TRUST TWO, )
individually and derivatively on behalf of J.G. )
Wentworth, Inc.; )

       Plaintiffs, )

       v. )    C.A. No. 9051-CB

J.G. WENTWORTH, INC., now known as )
FOREST AVE. HOLDCO, INC.; DAVID )
MILLER; PAUL S. LEVY; FRANCISCO J. )
RODRIGUEZ; ALEXANDER R. CASTALDI; )
J.G. WENTWORTH, LLC; JGW HOLDCO, )
LLC; JLL JGW DISTRIBUTION, LLC; JLL )
PARTNERS FUND V, L.P.; JLL FUND V )
AIF I, LP; JLL FUND V AIF II, LP and )
JGWPT HOLDINGS, LLC, )

       Defendants, )

       and )

J.G. WENTWORTH, INC., )

       Nominal Defendant. )

## MEMORANDUM OPINION

Date Submitted: June 25, 2014
Date Decided: September 18, 2014

Russell C. Silberglied, Rudolph Koch and Christopher H. Lyons of Richards, Layton & Finger, P.A., Wilmington, Delaware, Attorneys for Plaintiffs.

Robert S. Saunders, Michelle L. Davis and Sarah R. Martin of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware, Attorneys for Defendants and Nominal Defendant.

**BOUCHARD, C.**

## I.    INTRODUCTION

This action involves a dispute between two co-founders and former executives of the J.G. Wentworth operating companies and several entities in the current J.G. Wentworth corporate family, which are in the business of buying and selling structured settlements and annuity payments.

In 2007, Plaintiffs Gary Veloric, Michael Goodman, The Goodman 2007 Grantor Retained Annuity Trust One and The Goodman 2007 Grantor Retained Annuity Trust Two (collectively, the "Plaintiffs") became parties to a Tax Receivable Agreement (the "TRA") entitling them to receive payments derived from certain tax benefits that defendant J.G. Wentworth, Inc. ("Wentworth") may realize in the future.  Significantly, Plaintiffs are not entitled to receive any such payments until after the tenth anniversary of the TRA unless there has been a change of control (as defined in the TRA) in the interim and, as things turned out, the amount of such payments stands to be substantially greater for Plaintiffs if a change of control has occurred (approximately $35 million according to Plaintiffs) than if they must wait until after the tenth anniversary of the TRA (potentially $0).  This is because the payments owed to Plaintiffs under the TRA are calculated based on certain *assumed* tax benefits in the event of a change of control as opposed to the *actual* tax benefits realized if the TRA runs its course.

In October 2013, Plaintiffs filed this action asserting that Wentworth and other defendants breached the TRA because they failed to pay Plaintiffs after a purported change of control that occurred in 2011 or, alternatively, in 2013.  Plaintiffs also advance a litany of other claims against defendants arising from the same underlying events for

1

anticipatory repudiation, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, aiding and abetting, and unjust enrichment. For these claims, Plaintiffs seek approximately $35 million in damages and a declaratory judgment.

Defendants moved to dismiss the complaint in its entirety for failure to state a claim upon which relief may be granted under Court of Chancery Rule 12(b)(6).[1] They primarily contend that no obligation has been triggered under the TRA to pay Plaintiffs because there has been no change of control as defined in the TRA.

In this opinion, I conclude that Plaintiffs have failed to state a claim for breach of contract because they have not alleged facts establishing a change of control that would give rise to liability under the plain and unambiguous terms of the TRA. Additionally, I find that Plaintiffs remaining claims, which largely duplicate and/or are governed by their contract claims, fail to state a claim upon which relief may be granted.

## II.    BACKGROUND[2]

The reader is forewarned that this case involves a maze of corporate entities and an alphabet soup of corporate names. Charts depicting the corporate structures at relevant points in time are set forth below in an effort to simplify the underlying facts as much as possible.

---

[1] Defendants also moved to dismiss the derivative breach of fiduciary claim for failure to comply with Court of Chancery Rule 23.1.

[2] Unless noted otherwise, the facts recited in this opinion are based on the well-pled allegations of the Verified Amended Complaint for Declaratory Relief, Specific Performance and Damages (the "Amended Complaint") and the documents attached to it.

### A. JLL Acquires the J.G. Wentworth Companies in 2005

In 1992, plaintiffs Gary Veloric ("Veloric") and Michael Goodman ("Goodman") co-founded the operating companies now popularly known as J.G. Wentworth. The J.G. Wentworth companies were (and remain today) in the business of buying and selling structured settlements and annuity payments. Their television commercials are well known to those who may "need cash now."

In 2005, non-party JLL Partners, Inc. ("JLL"), a private equity firm, formed defendant JLL JGW Distribution, LLC, a Delaware limited liability company ("JLL Distribution"), to acquire the J.G. Wentworth operating companies from Veloric, Goodman, and certain non-parties. At all times relevant to this case, JLL Distribution has been wholly-owned by three limited partnerships affiliated with JLL that the parties collectively refer to as "Fund V."[3] Through another series of JLL-affiliated entities, Fund V is, and at all times relevant to this case has been, managed by defendant Paul S. Levy ("Levy"), a managing director of JLL.[4]

In connection with JLL Distribution's acquisition of the J.G. Wentworth operating companies, Veloric and Goodman purchased minority interests in defendant J.G. Wentworth, LLC, a Delaware limited liability company ("JGW LLC"), which owns and operates the J.G. Wentworth operating companies through various non-party subsidiaries. Veloric and Goodman remained senior executives of the J.G. Wentworth companies.

---

[3] These defendants are JLL Partners Fund V, L.P., JLL Fund V AIF I, L.P., and JLL Fund V AIF II, L.P.

[4] Chart 7 below reflects the chain of control above Fund V.

**B.      The J.G. Wentworth Companies Conduct a Private Offering**

In 2007, Fund V and JLL Distribution sought to offer equity in the J.G. Wentworth companies through a private offering, to be followed soon thereafter by a public offering. In doing so, they allegedly wanted to maximize their investment by separating the to-be-offered equity interests from the value of the companies' favorable tax treatment.

They initiated a restructuring that involved several steps. Fund V and JLL Distribution first formed defendant JGW Holdco, LLC, a Delaware limited liability company ("Holdco"), to wholly-own JGW LLC.[5] Fund V and JLL Distribution next incorporated J.G. Wentworth, Inc., a Delaware corporation ("Wentworth"),[6] as a holding company. Wentworth had two classes of voting stock: Class A shares and Class B shares. It offered its Class A shares in a private offering in August 2007 pursuant to Rule 144A of the Securities Act of 1933. Wentworth's Class B shares, which JLL Distribution, Veloric, and Goodman obtained, had "extremely limited economic rights: they are not entitled to dividends, and are entitled only to par value on liquidation or dissolution, or on redemption."[7]

At all times relevant to this case, Wentworth has served as the sole managing member of Holdco, and individual defendants Levy, David Miller ("Miller"), Francisco

---

[5] Although the precise mechanics are unclear, at some point Veloric and Goodman were no longer minority members in JGW LLC.

[6] Wentworth is now known as Forest Ave. Holdco, Inc.

[7] Am. Compl. ¶ 41.

J. Rodriguez ("Rodriguez"), and Alexander R. Castaldi ("Castaldi") (collectively, the "Director Defendants") have served as the directors of Wentworth. The Director Defendants are managing directors of JLL and serve on the Wentworth board allegedly at the pleasure of Fund V and JLL Distribution.

After the private offering, JLL Distribution owned 52.4% of Wentworth's outstanding common stock, and Verolic and Goodman each owned 9.9%. The balance of Wentworth's equity (approximately 27.8%) was issued in the private offering.

JLL Distribution also owned a majority of Holdco's membership interests. Wentworth obtained a 13.9% economic interest in Holdco and became Holdco's sole managing member. Finally, Veloric and Goodman each obtained 9.9% membership interests in Holdco.

The corporate structure resulting from the transactions described above, as it existed when the TRA (discussed below) was signed, is depicted in Chart 1 below:

5



Chart 1:
When the Parties Executed the TRA in 2007

Fund V
100%
Plaintiffs          Private Offering        JLL Distribution
27.8%
19.8%    19.8%                    52.4%    52.4%
Wentworth                              Others
13.9%
Sole Managing Member                    13.9%
Holdco
100%
JGW LLC
100%
Operating
Business

Source: Am. Compl. ¶ 42

Plaintiffs allege that Wentworth's "equity interest in and contractual rights with Holdco are its only material assets."[8] In the Third Amended and Restated Limited Liability Company Agreement of Holdco (the "Holdco LLC Agreement"), Wentworth agreed it would not conduct business other than that related to its position as Holdco's sole managing member.[9] The Holdco LLC Agreement also required Holdco to provide funds for Wentworth to pay its debt, and it specifically references Wentworth's

---

[8] *Id.* ¶ 41.

[9] *Id.* ¶ 43.

obligations under the TRA that is the subject of this action.[10]  In the Rule 144A offering memorandum, Wentworth further "represented that it would cause Holdco to make distributions to it, to permit [it] to pay its debts and obligations."[11]

## C.     The Key Provisions of the TRA

Under the federal tax code, an exchange of membership interests in Holdco for Class A shares in Wentworth would allegedly cause a favorable adjustment to the tax basis of Holdco's assets.  It also would cause corresponding, favorable tax benefits to Wentworth.

On August 9, 2007, in conjunction with the private offering (and the anticipated public offering), JLL Distribution, Wentworth, and Plaintiffs executed the Tax Receivable Agreement (as defined above, the "TRA") to capture some of the tax benefits that might accrue to Wentworth in a public offering.[12]  This public offering ultimately did not occur.

---

[10] *Id.* ¶ 73.

[11] *Id.* ¶ 43.

[12] In their brief, Plaintiffs describe how tax receivable agreements operate:

> Tax receivable agreements involve creation of a corporate vehicle for a public offering, which becomes sole managing member of the existing entity.  That new company then agrees to pay the pre-existing investors in the downstream companies for the value of the companies' tax attributes, as those attributes are used after the offering.

Pls.' Ans. Br. 3-4 (citing Deborah L. Paul & Michael Sabbah, *Understanding Tax Receivable Agreements*, Practical Law The Journal, June 2013, at 74-79).

Under the TRA, Wentworth is obligated to make "Tax Benefit Payments" to the principals, including JLL Distribution and Plaintiffs, following a "Covered Taxable Year." The Tax Benefits Payments represent 85% of actual or assumed savings in taxes (depending on the context) realized from the tax basis step-ups that result from an exchange of Holdco membership interests for Wentworth Class A shares.

The TRA defines a Covered Taxable Year as a "Taxable Year" (a tax year under applicable tax laws) "ending (i) after the earlier to occur of the closing of the Taxable Year that includes the 10th anniversary of the Original Sale Date and the date of a Change of Control, and (ii) on or before an Early Termination Date."[13] The tenth anniversary of the original sale date would fall in 2017, which means that Wentworth would be required to make annual Tax Benefit Payments starting in 2018, unless a Change of Control occurs before then.

The TRA defines a "Change of Control" to occur in one of four enumerated situations. The parties agree that a Change of Control has not occurred with respect to the first two provisions, which correspond to a change in the voting control or board composition of Wentworth. The two Change of Control provisions relevant here are the first part of the third definition ("Paragraph 3(x)") and the fourth definition ("Paragraph 4"). Paragraph 3(x) provides that a Change of Control occurs if:

> there is consummated a merger or consolidation of [Wentworth] or any direct or indirect subsidiary of [Wentworth] (including [Holdco]) with any other corporation or other entity, and, immediately after the consummation of such merger or consolidation, . . . (x) the board of directors of

---

[13] The Early Termination Date trigger is not implicated in this action.

8

[Wentworth] immediately prior to the merger or consolidation does not constitute at least a majority of the board of directors of the company surviving the merger or, if the surviving company is a subsidiary, the ultimate parent thereof[.][14]

Paragraph 4 provides that a Change of Control occurs if:

there is consummated an agreement or series of related agreements for the sale or other disposition, directly, or indirectly, by [Wentworth] of all or substantially all of [Wentworth's] assets, other than such sale or other disposition by [Wentworth] of all or substantially all of [Wentworth's] assets to an entity, at least fifty percent (50%) of the combined voting power of the voting securities of which are owned by shareholders of [Wentworth] in substantially the same proportions as their ownership of [Wentworth] immediately prior to such sale.[15]

Plaintiffs allege the TRA was drafted almost exclusively by Fund V, JLL Distribution, and their counsel and they did not make any changes to the definition of "Change of Control" in the draft that was presented to them.[16]

If there is no Change of Control, then the Tax Benefit Payments owed to the principals (starting in 2018) are calculated by comparing Wentworth's actual tax liability for a Covered Tax Year with its hypothetical liability had there been no tax basis step-up. In contrast, if there is a Change of Control, then the Tax Benefit Payments are calculated pursuant to a formula in the TRA that assumes Wentworth would have sufficient taxable income to utilize all the deductions created by the tax basis step-ups.

---

[14] Am. Compl. Ex. A (TRA), art. I.

[15] *Id.* The definition of "Change of Control" also contains a carve-out that is not implicated in this action.

[16] Am. Compl. ¶ 48.

Several defendants allegedly told Plaintiffs in 2012 that Wentworth might not generate enough income to take advantage of the tax basis step-ups created by their exchange of membership interests—meaning that Plaintiffs' proportionate share of Wentworth's actual savings might be worthless.[17] If this were true, it would be desirable for Plaintiffs that a Change of Control occur because they would get paid faster (within months rather than sometime after 2017) and stand to be paid significantly more (a defined amount Plaintiffs estimate to be approximately $35 million rather than a percentage of actual tax savings, which could be zero).

If a Change of Control occurs, Wentworth has forty-five days from filing its federal tax return for the relevant Covered Tax Year to provide to the principals a "Tax Benefit Schedule."[18] A Tax Benefit Payment is then due within five days of delivery of a Tax Benefit Schedule. The TRA provides for a ninety-day grace period before the failure to make a Tax Benefit Payment can be deemed a material breach of the TRA, in which case Wentworth's obligations are accelerated and it must make an "Early Termination Payment."[19]

---

[17] *Id.* ¶ 137. These statements are discussed below in addressing Plaintiffs' claim for anticipatory repudiation.

[18] The TRA provides for a negotiation period and certain reconciliation procedures to resolve any disputes that may arise with respect to the Tax Benefit Schedule. *Id.* §§ 2.3(a)-(b), 7.2

[19] The TRA defines "Early Termination Payment" as "a payment equal to the present value, discounted at the Termination Rate, of all Tax Benefit Payments that would be required to be paid by the Corporation to such Principal beginning from the Early Termination Date assuming the Valuation Assumptions are applied." *Id.* art. I.

### D. Veloric and Goodman Exchange their Holdco Membership Interests for Wentworth Class A Shares

In approximately April 2009, Veloric and Goodman exchanged their membership interests in Holdco and their Class B shares in Wentworth for Class A shares in Wentworth. By this time, they were no longer executives of Wentworth.

These exchanges triggered Wentworth's obligation under the TRA to provide an "Exchange Basis Schedule" that reflected its resulting tax basis step-ups. The Exchange Basis Schedules, which were provided by Wentworth's accounting firm in 2011, stated that the tax basis step-ups created by Veloric's and Goodman's exchanges were $43,464,817 each.[20] Based on the relevant valuation assumptions set forth in the TRA, and calculated as a net present value as of October 2012, Wentworth would allegedly owe $35,232,353 to Plaintiffs "in the event of an acceleration of the payments under the TRA arising from a breach."[21] This calculation is the basis of Plaintiffs' request for approximately $35 million in damages.

### E. The J.G. Wentworth Corporate Family is Reorganized through a Prepackaged Bankruptcy Plan

In May 2009, Wentworth, Holdco, and JGW LLC filed petitions for a Chapter 11 bankruptcy. The debtors filed a consensual, prepackaged plan of reorganization.

The plan did not impair Plaintiffs' interest in the TRA, and the plan expressly provided that it "shall not constitute a 'change of control' under any provision of any

---

[20] *Id.* ¶ 79.

[21] *Id.* ¶ 80.

contract . . . of the Debtors,"[22] which would include the TRA. In addition, the plan provided that each debtor "shall be deemed to have assumed each executory contract and unexpired lease to which one or more of the Debtors is a party."[23] Plaintiffs thus contend that Holdco and JGW LLC assumed Wentworth's obligations under the TRA.

In June 2009, the bankruptcy court approved the debtors' plan of reorganization. Pursuant to the plan, JLL Distribution invested $100 million in Holdco to fund JGW LLC's obligations to certain creditors and its acquisition of additional structured settlements and annuity payments; that investment "entitled JLL Distribution to $100 million worth" of Holdco membership interests.[24] Also pursuant to the plan, the capital structures of certain defendants were restructured. Veloric's and Goodman's interests in Wentworth were diluted to 0.0000037% each, with JLL Distribution owning 99.999985%.[25] Similarly, although Wentworth remained Holdco's sole managing member, its 13.9% interest in Holdco was diluted to 0.000015%. JLL Distribution also owned the remaining 99.999985% of Holdco. Finally, Holdco's 100% economic and voting interest in JGW LLC was diluted to 70%. A class of creditors whose interests were impaired in the reorganization plan became preferred stockholders of JGW LLC, collectively owning a 30% economic and voting interest in it.

---

[22] *Id.* ¶ 92.

[23] *Id.* ¶ 93.

[24] *Id.* ¶ 88.

[25] The holders of the remaining interests (0.0000076%) of Wentworth are not relevant here.

12

Chart 2 reflects the corporate structure after the bankruptcy reorganization in June 2009:



## F. The Peach Merger and the JGW Merger

In 2011, JGW LLC acquired the operating assets of Peachtree Financial Solutions, which was also in the structured settlement and annuity payment business. This acquisition was completed in two steps on July 12, 2011: (i) a subsidiary of the Peachtree companies, Orchard Acquisition Company, LLC ("Orchard"), merged with and into a newly formed, wholly-owned subsidiary of JGW LLC called Peach Acquisition LLC

("Peach LLC"), with Orchard as the surviving entity (the "Peach Merger");[26] and (ii) JGW LLC merged with and into JGW Holdings Merger Sub LLC, a wholly-owned subsidiary of defendant JGWPT Holdings LLC ("Peachtree LLC"), with JGW LLC as the surviving entity (the "JGW Merger"). Chart 3 reflects the corporate structure immediately before the Peach Merger and the JGW Merger:



[26] Plaintiffs contend the operative merger agreement for the Peach Merger was first disclosed to them on October 28, 2013, in a filing by non-party JGWPT Holdings Inc. with the Securities and Exchange Commission. Pls.' Ans. Br. 10.

After these mergers, the equity interests in JGW LLC were converted into interests in Peachtree LLC. The economic ownership of Peachtree LLC was as follows: (i) 45.7% by Holdco; (ii) 5.1% by JLL Distribution; and (iii) the remaining interests by the Peachtree companies and other non-parties. Peachtree LLC owned 100% of the voting and economic interests in JGW LLC, which owned 100% of the voting and economic interests in Orchard. Chart 4 reflects the corporate structure after the Peach Merger and the JGW Merger:



15

Plaintiffs contend that each of these two mergers constituted a Change of Control under the TRA: the Peach Merger under Paragraph 3(x), and the JGW Merger under Paragraph 4. As I will discuss below, the parties offer different interpretations of who the "ultimate parent" of Orchard was immediately after the Peach Merger for purposes of Paragraph 3(x). Plaintiffs contend that the ultimate parent was Fund V or, alternatively, JGW LLC.[27] Defendants, in addition to arguing that Peach LLC was not a subsidiary of Wentworth, contend that its ultimate parent would have been Wentworth.

G.      **Communications between Plaintiffs and Certain Defendants about a Potential Change of Control in 2012**

At some point during the fall of 2012, Plaintiffs learned through public reports that Fund V and JLL Distribution had hired two investment banks to sell the assets of

---

[27] Plaintiffs allege that JGW LLC's Fifth Amended and Restated Limited Liability Company Agreement was the operative LLC agreement after the Peach Merger. Pursuant to Section 4.1(a) of that LLC agreement, JGW LLC's business and affairs are to be managed by a ten-member board of directors designated pursuant to a contractual formula. Holdco had the right to designate four of ten directors, and its designees were entitled to two votes each on any matter presented to the board. The other directors of JGW LLC were entitled to one vote each. Thus, the Director Defendants represented four of ten directors, but, as Plaintiffs conceded, they "had enough voting power to control the board of JGW LLC." Am. Compl. ¶ 101.

Defendants assert that the operative LLC agreement immediately after the Peach Merger was JGW LLC's Sixth Amended and Restated Limited Liability Company Agreement, which is extraneous to the Amended Complaint. Defs.' Op. Br. 25. That agreement purportedly established a four-member board of directors, comprised of the four Director Defendants.

Because I ultimately conclude that the composition of the board of JGW LLC after the Peach Merger is immaterial to my disposition of defendants' motion to dismiss, I need not resolve whether JGW LLC's Sixth Amended and Restated Limited Liability Company Agreement may be considered at the pleadings stage.

16

Peachtree LLC and JGW LLC. In November 2012, Veloric contacted executives and agents of certain defendants, apparently asserting that any sale of Peachtree LLC would constitute a Change of Control under the TRA. He received several responses, each of which Plaintiffs contend was an anticipatory repudiation by defendants of their obligations under the TRA. These statements are discussed below in analyzing the merits of Plaintiffs' claim for anticipatory repudiation. The potential sale of Peachtree LLC that concerned Plaintiffs in 2012 did not occur.

## H. The IPO Merger in 2013

On October 7, 2013, non-party JGWPT Holdings Inc. ("Peachtree Inc.") filed a Form S-1 Registration Statement with the SEC to conduct an initial public offering. The IPO occurred on November 8, 2013. Plaintiffs concede they did not allege the precise managerial structure of Peachtree LLC at this time.[28] Chart 5 reflects the corporate structure immediately before what I define as the "IPO Merger."

---

[28] Pls.' Ans. Br. 32-33.



Source: Am. Compl. ¶ 128

On November 13, 2013, in connection with the IPO, Peachtree LLC merged with and into a limited liability company of the same name, which was majority owned by Peachtree Inc. (the "IPO Merger"). After the IPO Merger, Peachtree Inc. owned a 38.6% economic interest in, and became the sole managing member of, the surviving Peachtree LLC. In turn, JLL Distribution obtained an approximately 63.4% voting interest in Peachtree Inc. when its majority interest in Peachtree Inc. and Holdco's interest in

18

Peachtree Inc. are combined.[29]  Chart 6 reflects the corporate structure after the IPO

Merger in 2013.



Chart 6:
Immediately after the IPO Merger in 2013

Source: Am. Compl. ¶¶ 128, 132

Plaintiffs contend that the IPO Merger constituted a Change of Control under

Paragraph 3(x) of the TRA.  As I will discuss below, the parties once again offer different

interpretations of who the "ultimate parent" of Peachtree LLC was immediately after the

IPO Merger for purposes of Paragraph 3(x).  Plaintiffs submit that the ultimate parent

---

[29] As reflected in Chart 6, JLL Distribution held over 99% of the interests in Wentworth, which was the sole managing member of Holdco.

was Fund V or, alternatively, Peachtree Inc.[30]  Defendants, in addition to arguing that Peachtree LLC was not a subsidiary of Wentworth, contend that its ultimate parent would have been Wentworth.

## I.      Procedural Background

On October 30, 2013, Plaintiffs commenced this action against defendants asserting certain individual and derivative claims.  On November 27, 2013, defendants moved to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim and Court of Chancery Rule 23.1 for failure to make a pre-suit demand upon the Wentworth board of directors or to plead facts excusing such demand.

On January 23, 2014, in response to defendants' opening brief in support of their motion to dismiss, Plaintiffs filed the Amended Complaint.  On February 6, 2014, defendants moved to dismiss the Amended Complaint under Rule 12(b)(6) and Rule 23.1.

In the Amended Complaint, Plaintiffs assert seven causes of action:

- Breach of contract against JLL Distribution, Wentworth, Holdco, and JGW LLC

  for failing to provide Tax Benefit Schedules and to make Tax Benefit Payments

---

[30] Pursuant to a Director Designation Agreement, Fund V, through JLL Distribution and Holdco, has the right to designate four of eight members to the board of directors of Peachtree Inc.  Fund V's designees are entitled to cast two votes on any matter; the other directors are entitled to one vote each.  After the IPO Merger, the Peachtree Inc. board was comprised of four non-party directors (entitled to one vote each) and the four Director Defendants (entitled to two votes each as Fund V's designees).  Thus, although the Director Defendants are four of Peachtree Inc.'s eight directors, Plaintiffs again concede that Fund V and JLL Distribution "will have effective control over the [Peachtree Inc.] board."  Am. Compl. ¶ 128.  I ultimately conclude that the composition of the board of Peachtree Inc. is immaterial to my disposition of defendants' motion to dismiss.

20

allegedly due to Plaintiffs under the TRA, as well as for anticipatory repudiation of their obligations under the TRA (Count I);

- Breach of the implied covenant of good faith and fair dealing of the TRA and the Holdco LLC Agreement against Wentworth, Holdco, and JGW LLC (Count II);

- Breach of contract against Holdco for failing to loan money to Wentworth to make Tax Benefit Payments allegedly due to Plaintiffs under the TRA (Count III);

- Breach of fiduciary duty asserted derivatively against the Director Defendants, Fund V, and JLL Distribution for their conduct related to the Peach Merger and the JGW Merger (Count IV);

- Aiding and abetting against Fund V, JLL Distribution, and Peachtree LLC (Count V);

- Unjust enrichment against Holdco, Peachtree LLC, and JGW LLC for unjustly retaining the funds that should be used to make Tax Benefit Payments allegedly due under the TRA (Count VI); and

- Declaratory judgment against Fund V, JLL Distribution, Wentworth, Holdco, Peachtree LLC, and JGW LLC as to their joint and several liability for Plaintiffs' damages (Count VII).

Under various theories, these claims all revolve around whether a Change of Control occurred under the TRA, which would entitle Plaintiffs to certain Tax Benefit Schedules, Tax Benefit Payments, and possibly Early Termination Payments.

I consider the sufficiency of Plaintiffs' claims in the order in which they were alleged. In doing so, I conclude that Plaintiffs have failed to state a claim for relief under any of Counts I-VII. Accordingly, I dismiss the Amended Complaint in its entirety under Rule 12(b)(6).

## III.   LEGAL ANALYSIS

### A.      The Standard of Review under Rule 12(b)(6)

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim must be denied unless, assuming the well-pled allegations to be true and viewing all reasonable inferences from those allegations in the plaintiffs' favor, I do not find there to be a "reasonably conceivable set of circumstances" in which the plaintiffs could recover.[31] I do not need to accept as true any "conclusory allegations unsupported by specific facts," nor must I draw any "unreasonable inferences in the plaintiffs' favor."[32] The failure to plead an element of a claim warrants dismissal under Rule 12(b)(6).[33]

### B.      Contract Interpretation under Delaware Law upon a
### Motion to Dismiss under Rule 12(b)(6)

Delaware law "adheres to the objective theory of contract interpretation."[34] I thus interpret a clear and unambiguous term of a contract governed by Delaware law, such as

---

[31] *See Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[32] *Gantler v. Stephens*, 965 A.2d 695, 704 (Del. 2009).

[33] *See Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 972 (Del. Ch. 2000).

[34] *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008)

the TRA,[35] according to its plain meaning.[36]  A contract term is ambiguous only when it is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[37]  At the motion to dismiss stage, ambiguous contract provisions must be interpreted most favorably to the non-moving party.[38]  Thus, "[d]ismissal, pursuant to Rule 12(b)(6), is proper only if the defendants' interpretation[s] [are] the *only* reasonable construction[s] as a matter of law."[39]

Several contract interpretation principles guide my inquiry into whether a particular term is reasonably susceptible of different meanings.  For instance, I may consider how a term operates with respect to the contract as a whole.[40]  Similarly, I should avoid interpreting a term in an unreasonable way that would yield an absurd result[41] or that would render other contractual language superfluous.[42]

---

[35] TRA § 7.13.

[36] *See Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).

[37] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[38] *See Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 881 (Del. Ch. 2009).

[39] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003).

[40] *See Alliance Data Sys. Corp. v. Blackstone Capital P'rs V L.P.*, 963 A.2d 746, 769 (Del. Ch. 2009), *aff'd*, 976 A.2d 170 (Del. 2009) (TABLE).

[41] *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010).

[42] *See Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 741 (Del. Ch. 2008).

## C.     Count I: Breach of Contract

To state a claim for breach of contract under Delaware law, a plaintiff must allege "1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) resulting damage to the plaintiff."[43]  Plaintiffs allege that each of the Peach Merger, the JGW Merger, and the IPO Merger constituted a Change of Control under the TRA.  They contend that the failure of JLL Distribution, Wentworth, Holdco, and JGW LLC to provide the Tax Benefit Schedules and to make Tax Benefit Payments within the designated ninety-day grace periods after the purported Changes of Control constitute material breaches of the TRA.  Plaintiffs' request for approximately $35 million in damages represents their estimate of the net present value of the Early Termination Payments they claim they are now owed.

### 1.     Whether the Peach Merger Constituted a Change of Control under Paragraph 3(x)

Paragraph 3(x) of the TRA provides that a Change of Control occurs if:

> there is consummated a merger or consolidation of [Wentworth] or any direct or indirect subsidiary of [Wentworth] (including [Holdco]) with any other corporation or other entity, and, immediately after the consummation of such merger or consolidation, . . . (x) the board of directors of [Wentworth] immediately prior to the merger or consolidation does not constitute at least a majority of the board of directors of the company surviving the merger or, if the surviving company is a subsidiary, the ultimate parent thereof[.]

The two terms of Paragraph 3(x) whose meanings are in dispute are "subsidiary" and "ultimate parent."

---

[43] *H-M Wexford LLC v. Encorp. Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

24

For purposes of my analysis, Paragraph 3(x) can be reconfigured as follows: a Change of Control occurs where (i) there is a merger of (ii) "any direct or indirect subsidiary of [Wentworth] (including [Holdco])" such that (iii) immediately after the merger, Wentworth's board of directors (*i.e.*, the Director Defendants) immediately prior to the merger do not constitute "at least a majority of the board of the company surviving the merger or, if the surviving company is a subsidiary, the ultimate parent thereof."

The Peach Merger, depicted in Chart 3 above, plainly involved a merger. Orchard, a subsidiary of the Peachtree companies, merged with and into Peach LLC, a subsidiary of JGW LLC, with Orchard as the surviving entity. The remaining dispute with respect to this claim is two-fold: whether Peach LLC was a "subsidiary" of Wentworth, and which entity was the "ultimate parent" of Orchard after the merger.

### i. The Peach Merger Involved a Merger of Peach LLC, a Subsidiary of Wentworth

Defendants contend that Peach LLC was not an indirect subsidiary of Wentworth based on prominent secondary sources that define a subsidiary as an entity that is "controlled by another corporation by reason of the latter's ownership of at least a majority of the shares of the capital stock" or an entity "in which a parent corporation has a controlling share." Consequently, defendants argue that because Wentworth owned less than 1% of Holdco, Holdco was not a subsidiary of Wentworth and, by extension, neither was JGW LLC (through Holdco LLC) nor Peach LLC (through JGW LLC) an indirect subsidiary of Wentworth.

25

I do not find defendants' position to be a reasonable construction of the term "subsidiary" as it is used in Paragraph 3(x). That provision expressly identifies Holdco as a subsidiary of Wentworth, even though, when the parties executed the TRA, Wentworth's interest in Holdco was only 13.9%, not a majority and not what ordinarily may be considered a controlling share.[44] I also disagree with defendants' argument that the failure to include the phrase "subsidiaries of Holdco" in the parenthetical in Paragraph 3(x) quoted above (so that it would read "(including Holdco *and subsidiaries of Holdco*)") means that no subsidiary of Holdco can be deemed a subsidiary of Wentworth for purposes of the TRA. To accept that interpretation would render meaningless the phrase "indirect subsidiary" in Paragraph 3(x).

Because Paragraph 3(x) expressly identified Holdco as a subsidiary despite Wentworth's less-than-controlling interest when the TRA was signed, it is not reasonable in my view to interpret the term "subsidiary" as used in the TRA to require a majority or controlling interest by one entity in another. Holdco only could have been identified as Wentworth's subsidiary because, with Wentworth as its sole managing member, it was under Wentworth's control. I thus interpret "subsidiary" as used in Paragraph 3(x) to

---

[44] *See, e.g.*, *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 552-53 (Del. Ch. 2003) (concluding after trial that the chairman and chief executive officer of a corporation, who held approximately 35% of the stock and had influence over an additional 5% of stock and options held by his family members, was a controlling stockholder because he "possesses a combination of stock voting power and managerial authority that enables him to control the corporation, if he so wishes"); *see also In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 665 (Del. Ch. 2013) ("In *In re Cysive*, this court made, perhaps, its most aggressive finding that a minority blockholder was a controlling stockholder.").

mean an entity under Wentworth's control.[45] By extension, the plain meaning of the term "indirect subsidiary" means a subsidiary of one of Wentworth's subsidiaries. This interpretation is consistent with decisions of Delaware courts that, in the context of 8 *Del. C.* § 220, have determined whether an entity is a subsidiary of a corporation by looking to whether the corporation, in addition to owning at least part of the entity, exercises control over it.[46]

Here, based on the only reasonable interpretation of "subsidiary," the chain of control immediately prior to the Peach Merger was as follows: Wentworth controlled Holdco (despite its less-than-1% interest) by virtue of its position as Holdco's sole managing member and the well-pled allegations of control over Holdco's business and affairs; Holdco controlled JGW LLC through its majority interest; and JGW LLC controlled Peach LLC as a wholly owned subsidiary. I therefore conclude under the plain meaning of Paragraph 3(x) that Peach LLC was an indirect subsidiary of Wentworth.

---

[45] For the avoidance of doubt, this interpretation of "subsidiary" is in the limited context of the TRA. *See, e.g.*, *Rag Am. Coal Co. v. AEI Res., Inc.*, 1999 WL 1261376, at \*14 (Del. Ch. Dec. 7, 1999) ("Parties may contractually agree to any definition of "Tax" they choose, regardless of that term's use in other contexts.").

[46] *See, e.g.*, *Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 510 (Del. 2005) ("[A] parent/subsidiary relationship [for purposes of what is now 8 *Del. C.* § 220(a)(2)] is established by applying the fiduciary definition of controlling stockholder."); *see also Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1114 (Del. 1994) (concluding that than a less-than-majority stockholder may nonetheless be deemed a controlling stockholder through evidence of actual control over the corporation's business and affairs).

27

ii. **Because the Ultimate Parent of Orchard, a Subsidiary, after the Peach Merger was Fund V, and Because Levy was the Sole Managing Member of Fund V, There was No Change of Control under Paragraph 3(x)**

The parties offer competing interpretations of "ultimate parent" in Paragraph 3(x) of the TRA. Plaintiffs contend that Fund V or, alternatively, JGW LLC was the ultimate parent of Orchard. In opposition, defendants submit that Wentworth was Orchard's ultimate parent. Neither of the parties presented any Delaware case law, case law from another jurisdiction, or any persuasive secondary source (such as an annotated model agreement) interpreting the phrase "ultimate parent" in the context of a tax receivable agreement.[47]

Simply because parties dispute the meaning of "ultimate parent" does not mean that the term is ambiguous.[48] Rather, the inquiry is whether the term is reasonably susceptible to two different meanings as it is used in Paragraph 3(x).[49]

---

[47] The lack of guidance on the interpretation of this phrase may be due to the relative novelty of this type of agreement. *See, e.g.*, Victor Fleischer & Nancy Staudt, *The Supercharged IPO*, 67 Vand. L. Rev. 307, 310-12 (2014) (discussing the first use of a tax receivable agreement when taking a company public over two decades ago and contending that this practice became more common for private equity firms in the last ten years). I do, however, find it mystifying that neither party could identify a single "ultimate parent" without suggesting other entities in the alternative. *See, e.g.*, Tr. of Oral Arg. on Defs.' Mot. to Dismiss 33 ("I think it's either got to be Wentworth Inc. or [JLL] Distribution.") (defendants' counsel), 120 ("[W]ith respect to the IPO merger, it's either Fund V or it's [Peachtree LLC].") (Plaintiffs' counsel).

[48] *See City Investing Co. Liquidating Trust v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

[49] *See Rhone-Poulenc*, 616 A.2d at 1196.

I conclude that "ultimate parent" is not reasonably susceptible to more than one meaning. In my opinion, where one entity controls another, even without a majority or controlling interest, they can be said to be in a parent-subsidiary relationship. Thus, for purposes of the TRA, the parent (if there is one) of an entity is whatever entity that controls it.[50] This interpretation is the reciprocal of what I found to be the only reasonable interpretation of the term "subsidiary" as used in the TRA.

I agree with defendants that the only reasonable interpretation of "ultimate" is that of "last" or "final."[51] Plaintiffs have not offered a competing, reasonable interpretation. Indeed, at oral argument, Plaintiffs' counsel acknowledged that it is difficult "to conceive of how ultimate parent could mean anything but ultimate, top, top of the chart."[52] Thus, in my opinion, the term "ultimate parent" in Paragraph 3(x) yields only one reasonable construction: the last or final entity at the top of a corporate chain of control.[53] This

---

[50] Again, this interpretation of "parent" is specific to the TRA.

[51] Defs.' Op. Br. 24 n.6 (citing *Merriam-Webster's Collegiate Dictionary* 1356 (11th ed. 2009)).

[52] Tr. of Oral Arg. on Defs.' Mot. to Dismiss 106.

[53] For this reason, I find Plaintiffs' assertion that the "ultimate parent" of Orchard after the Peach Merger in 2011 was its immediate parent, JGW LLC, to be an unreasonable construction of the term "ultimate parent." By the same token, Plaintiffs' contention that Peachtree LLC's "ultimate parent" after the IPO Merger in 2013 was Peachtree Inc., its immediate parent, is also unreasonable.

interpretation is in line with the general use of the term "ultimate parent" by Delaware courts.[54]

For the reasons explained above, Peach LLC was an indirect subsidiary of Wentworth immediately before the Peach Merger. Orchard was likewise a wholly-owned subsidiary of JGW LLC after the Peach Merger, which requires that I identify the "ultimate parent" of Orchard. Applying the only reasonable interpretation of "ultimate parent," the chain of control immediately after the Peach Merger, as depicted in Chart 4, was as follows: JGW LLC was Orchard's parent; Peachtree LLC was JGW LLC's parent, it is reasonable to infer that Holdco was Peachtree LLC's parent;[55] Wentworth was Holdco's parent as its sole managing member; JLL Distribution was Wentworth's parent through its greater than 99% interest; and Fund V was JLL Distribution's parent. Plaintiffs identify the remaining chain of control above Fund V in the Amended Complaint as follows:

---

[54] *See, e.g.*, *Judah v. Shanghai Power Co.*, 494 A.2d 1244, 1245 (Del. 1985) (referring to Boise Cascade Corporation, where it was "the ultimate owner of most of Shanghai [Power Company's ("Shanghai")] common stock and where Shanghai wholly-owned Western District Power Company ("Western"), as the "ultimate parent" of Shanghai and Western); *Andaloro v. PFPC Worldwide, Inc.*, 2005 WL 2045640, at *1 (Del. Ch. Aug. 19, 2005) (referring to PNC Financial Services Group, Inc., which was the immediate parent of PFPC Holding Corp., which in turn was the immediate parent of PFPC Worldwide, Inc. ("Worldwide"), as the "ultimate parent" of Worldwide); *In re BHC Commc'ns S'holder Litig., Inc.*, 789 A.2d 1, 11 (Del. Ch. 2001) (referring to Chris-Craft Industries, Inc. ("Chris-Craft") as the "ultimate parent corporation" of United Television, Inc. ("UTV"), where Chris-Craft owned a majority interest in BHC Communications, Inc., "which corporation, in turn own[ed] a majority interest" in UTV).

[55] *See* Section III.C.3.ii below.

Fund V, as a limited partnership (or set of limited partnerships), did not have a "board of directors," but it was managed by its general partner, JLL Associates V, L.P., which was managed by its general partner JLL Associates G.P. V, L.L.C., which, in turn, was managed by its sole managing member, Defendant Paul Levy.[56]

Thus, the ultimate parent of Orchard immediately after the Peach Merger was JLL Associates G.P. V, L.L.C. ("Fund V G.P.").[57] Chart 7 reflects the chain of control above Fund V:



Chart 7:
Chain of Control above Fund V

Levy

Sole Managing Member

Fund V G.P.

100%

JLL Associates V, L.P.

100%

Fund V

Source: Am. Compl. ¶ 26, Ex. J at 131-32

Plaintiffs do not contend that a Change of Control occurred because Fund V G.P. does not have a board of directors. Rather, Plaintiffs argue that, because all four Director

---

[56] Am. Compl. ¶ 111.

[57] This interpretation is consistent with defendants' public statements that Levy, as the sole managing member of Fund V G.P., "may be deemed the beneficial owner of all of [JLL Distribution's and Holdco's] Class B Shares of [Peachtree Inc.], with shared voting and dispositive power with regard to such Class B Shares." Am. Compl. Ex. J at 131-32.

Defendants did not manage Fund V G.P., they could not have constituted a majority of the managers of Orchard's ultimate parent after the Peach Merger. That is, Plaintiffs argue that "one person is not 'at least a majority' of the four-person Wentworth [] board."[58] From defendants' perspective, Plaintiffs "reversed the language of Paragraph 3(x) and applied the test backwards."[59] Defendants argue instead that the four Director Defendants did constitute a majority of the managers of Fund V G.P. because Levy, one of the Director Defendants, was Fund V G.P.'s sole managing member.

In my opinion, defendants offer the only reasonable construction of this clause of Paragraph 3(x). Interpreting the clause according to its plain meaning, the Director Defendants *did* constitute a majority of the managers of Fund V G.P.—namely, Levy, as the sole manager of Fund V G.P., constituted a majority of one. That the other directors of Wentworth were absent from Fund V's governing body is irrelevant. By analogy, to say that the Philadelphia Phillies baseball team (consisting of twenty-five players) constitutes a majority of the starters on the National League All-Star team (consisting of nine players) is not to say that every Phillie has the privilege of being a starter in the All-Star Game. Plaintiffs' interpretation would be reasonable if Paragraph 3(x) included a qualifier to specify that *all members of* the board of directors of Wentworth must constitute a majority of the board of the ultimate parent. But, that or similar language is absent from Paragraph 3(x) of the TRA.

---

[58] Pls.' Ans. Br. 23 n.9.

[59] Defs.' Reply Br. 9.

Notably, in the second definition of a Change of Control, which refers to the composition of the Wentworth board, the TRA includes the phrase "majority of the number of directors of Wentworth."[60] That is, the parties included a specific reference to the number of directors in the second part of the Change of Control definition when referring to the composition of Wentworth's board, but not in Paragraph 3(x) when referring to the board of a subsidiary company or ultimate parent thereof. This distinction further supports my conclusion that Paragraph 3(x) cannot mean what Plaintiffs contend it means.[61]

Moreover, in my opinion, Plaintiffs' interpretation of Paragraph 3(x) would lead to absurd results given the corporate structure of J.G. Wentworth when the parties executed the TRA in 2007. At that time, as discussed above, the ultimate parent of any of Wentworth's direct or indirect subsidiaries was Fund V G.P. Thus, under Plaintiffs' interpretation, *any* merger involving a Wentworth subsidiary would trigger a Change of Control under Paragraph 3(x)—and an approximately $35 million payment according to Plaintiffs—irrespective of the fact that the composition of the board of the ultimate parent *never changed.* Levy was the sole managing member of Fund V G.P. when the TRA was signed in 2007 and has been at all times since.

---

[60] The second definition provides that a Change of Control occurs if certain individuals "cease for any reason to constitute a majority of the number of directors of [Wentworth] then serving." TRA art. I.

[61] *See MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *7 (Del. Ch. Dec. 30, 2010) ("The use of different language in the two sections shows the parties knew how to cover [an issue more broadly] when that was their intent.").

Similarly, if the four Director Defendants continued to comprise the Wentworth board before the occurrence of a subsidiary merger covered by Paragraph 3(x), then, under Plaintiffs' position, there would be a Change of Control even if three of the Director Defendants—*and no one else*—constituted the board of directors of the ultimate parent after the merger. These absurd outcomes demonstrate to me that Plaintiffs' construction of Paragraph 3(x) is plainly not reasonable.[62]

For the foregoing reasons, although Plaintiffs sufficiently alleged that the Peach Merger was a merger involving an indirect subsidiary of Wentworth, they have not adequately alleged that the Director Defendants did not constitute a majority of the board of the ultimate parent of Orchard immediately after the Peach Merger. Accordingly, the Amended Complaint fails to state a claim for breach of the TRA based on a Change of Control arising from the Peach Merger.

---

[62] *See Osborn*, 991 A.2d at 1160 ("An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract.").

Plaintiffs also contend that defendants, because they allegedly stood to benefit most financially from a Change of Control, wanted this type of hair-trigger provision. Am. Compl. ¶ 53; Pls.' Ans. Br. 22 n.8. However, in my view, no reasonable person would agree to a provision that would preclude, at a cost of over $35 million, even the most minor corporate restructuring that is wholly internal to Wentworth and its subsidiaries.

### 2. Whether the JGW Merger Constituted a Change of Control under Paragraph 4

For the JGW Merger, which is depicted in Chart 3 above, Plaintiffs contend there was a Change of Control under Paragraph 4 of the TRA. Paragraph 4 provides that a Change of Control occurs if:

> there is consummated an agreement or series of related agreements for the sale or other disposition directly, or indirectly, by [Wentworth] of all or substantially all of [Wentworth] assets, other than such sale or other disposition by [Wentworth] of all or substantially all of [Wentworth's] assets to an entity, at least fifty percent (50%) of the combined voting power of the voting securities of which are owned by shareholders of [Wentworth] in substantially the same proportions as their ownership of [Wentworth] immediately prior to such sale.

Defendants argue that because Plaintiffs allege that Wentworth's only asset before and after the JGW Merger was exactly the same—its 0.000015% interest in Holdco—there was no disposition of any of Wentworth's assets, let alone substantially all of them. In response, Plaintiffs assert that Wentworth's assets should include "its indirect ownership of and control over the assets of its subsidiaries (including JGW LLC)"[63] such that the merger of JGW LLC into a subsidiary of Peachtree LLC constituted a disposition of substantially all of Wentworth's assets.

I do not find Plaintiffs' interpretation of Paragraph 4 to be reasonable. I find the term "[Wentworth's] assets" to be clear and unambiguous, and I interpret it according to its plain meaning: "Wentworth's assets" means the assets owned by Wentworth. The reference to Wentworth's subsidiaries in Paragraph 3(x) shows that, when the parties to

---

[63] Pls.' Ans. Br. 30.

35

the TRA intended to include subsidiaries, they did so expressly. This distinction again supports my interpretation here. Accordingly, Plaintiffs' allegation that Wentworth's sole asset before the JGW Merger—its less-than-1% interest in Holdco—was the same after the JGW Merger[64] means that there is no well-pled disposition of all or substantially all of Wentworth's assets in the JGW Merger.

Even if Paragraph 4 could reasonably be construed such that the JGW Merger was a disposition by Wentworth of its assets, it would be far from "all or substantially all" of its assets. The TRA does not define "substantially all." Thus, it is appropriate to consider by analogy how that term is interpreted as it appears in 8 *Del. C.* § 271.[65]

To recap, through the JGW Merger, Holdco's 70% interest in JGW LLC was diluted to an approximately 45.7% interest in Peachtree LLC, which in turn owned 100% of JGW LLC. By Plaintiffs' logic, if Holdco's assets should count as its parent's (Wentworth's) assets before the JGW Merger, then so too should Peachtree LLC's assets count as its parent's (Holdco's) assets after the JGW Merger. In my opinion, it is not reasonably conceivable that a decrease in Holdco's ownership of JGW LLC from 70% to 45.7%—a decrease of approximately 35%—would satisfy the "quantitative and

---

[64] Am. Compl. ¶¶ 104, 112.

[65] *See, e.g.*, *Liberty Media Corp. v. Bank of New York Mellon Trust Co.*, 2011 WL 1632333, at *14 (Del. Ch. Apr. 29, 2011) ("I have difficulty perceiving how 'substantially all,' when used generically as an undefined term, could have a different meaning in an indenture than in a corporate statute."), *aff'd*, 29 A.3d 225 (Del. 2011).

qualitative test" of substantially all assets under Delaware law,[66] especially where, after the JGW Merger, Peachtree LLC controlled JGW LLC as a wholly-owned subsidiary, and Holdco controlled Peachtree LLC as a subsidiary.

The Amended Complaint thus fails to state a claim for breach of the TRA based on a Change of Control arising from the JGW Merger.

### 3. Whether the IPO Merger Constituted a Change of Control under Paragraph 3(x)

#### i. The IPO Merger Involved a Merger of Peachtree LLC, a Subsidiary of Wentworth

The IPO Merger is depicted in Chart 5 above. Defendants again raise the threshold argument that the entity that merged in the IPO Merger, Peachtree LLC, was not a subsidiary of Wentworth. Plaintiffs allege that Holdco owned 45.7% of the membership interests of Peachtree LLC, that Fund V and JLL Distribution collectively owned 5.1%, and that various non-parties owned the remainder. Defendants note there is no well-pled allegation as to which entity was Peachtree LLC's managing member immediately before the IPO Merger. Plaintiffs claimed in their brief that "the facts regarding the precise pre-merger managerial structure of [Peachtree LLC] have not been disclosed to Plaintiffs."[67] But, they submit, the Amended Complaint supports a reasonable inference that Holdco, as the holder of the largest membership interest,

---

[66] *See Hollinger Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342, 378 (Del. Ch. 2004) (citing *Gimbel v. Signal Cos., Inc.*, 316 A.2d 599, 606 (Del. Ch. 1974), *aff'd*, 316 A.2d 619 (Del. 1974)).

[67] Pls.' Ans. Br. 32-33.

37

controlled Peachtree LLC as a subsidiary. By extension, they assert that Peachtree LLC was Wentworth's indirect subsidiary.

Viewing Plaintiffs' well-pled allegations most favorably to them, as I must at the motion to dismiss stage, I agree that the Amended Complaint supports the reasonable inference that Holdco controlled Peachtree LLC immediately before the IPO Merger. Thus, based on the interpretation of "indirect subsidiary" outlined above, Peachtree LLC was an indirect subsidiary of Wentworth under the plain meaning of this unambiguous clause of Paragraph 3(x).

ii. **Because the Ultimate Parent of Peachtree LLC, a Subsidiary, after the IPO Merger was Fund V, and Because Levy was the Sole Managing Member of Fund V, There was No Change in Control under Paragraph 3(x)**

The parties again offer competing interpretations of "ultimate parent" in Paragraph 3(x) of the TRA in the context of the IPO Merger. Plaintiffs once more contend that Fund V or, alternatively, Peachtree Inc. was the ultimate parent of Peachtree LLC immediately after the IPO Merger. Defendants maintain that Wentworth was Peachtree LLC's ultimate parent.

The only reasonable interpretation of Paragraph 3(x) in the context of the IPO Merger is identical to that in the context of the Peach Merger. The chain of control after the IPO Merger is reflected in Chart 6 above. Peachtree Inc. held 38.6% in, and was the sole managing member of, Peachtree LLC. Similar to the interpretation above that Wentworth was Holdco's parent, it is reasonable to infer that Peachtree Inc. and Peachtree LLC were in a parent-subsidiary relationship, which again requires that I

38

identify Peachtree LLC's "ultimate parent." Peachtree Inc.'s parent was either JLL Distribution (through its majority interest) or Holdco, whose parent was Wentworth, whose parent was JLL Distribution. In either case, the analysis leads to JLL Distribution, whose parent was Fund V.

Based on the same chain of control for Fund V depicted in Chart 7, the ultimate parent of Fund V was Fund V G.P. Thus, Peachtree LLC's ultimate parent after the IPO Merger was Fund V G.P., whose sole managing member was Levy. Plaintiffs' technical argument here—that the four Director Defendants did not constitute a majority of the managers of Fund V G.P. after the IPO Merger—fails for the same reasons discussed above concerning the Peach Merger.

Thus, in my opinion, the only reasonable interpretation of Paragraph 3(x) is that, although it is reasonable to infer that the IPO Merger was a merger involving an indirect subsidiary of Wentworth, Plaintiffs have not adequately alleged that the Director Defendants did not constitute a majority of the board of the ultimate parent of Peachtree LLC after the IPO Merger. I therefore conclude that Plaintiffs have failed to state a claim for breach of the TRA based on a Change of Control arising from the IPO Merger.

### D. Count I: Anticipatory Repudiation

Plaintiffs allege that defendants repudiated their obligations under the TRA, thereby materially breaching the TRA and requiring Wentworth to make Early

39

Termination Payments to Plaintiffs of approximately $35 million.[68] Plaintiffs base their repudiation claim on four separate statements made in November 2012, discussed below.

Chancellor Allen cogently outlined the contours of the doctrine of anticipatory repudiation under Delaware law in *Carteret Bancorp, Inc. v. Home Group, Inc.*[69] The policy reason why Delaware recognizes a cause of action for anticipatory repudiation is plain: "[i]f it is clear that the promisor intends not to perform his promise, there seems little reason to force the parties to wait to have their rights and obligations determined while markets rise and fall and practical adjustments to the new state of affairs could be made."[70] Citing to two prominent contract treatises, Chancellor Allen concluded that a promisor must give an "unequivocal statement"[71] that is "positive and unconditional"[72] about its intent to not perform its contractual obligation before a promisee may assert a claim for anticipatory repudiation.[73] The Delaware Supreme Court has since used similar language to define repudiation under Delaware law as "an outright refusal by a party to

---

[68] Am. Compl. ¶ 176.

[69] 1988 WL 3010 (Del. Ch. Jan. 13, 1988), reprinted at 13 Del. J. Corp. L. 1115 (1988).

[70] *Id.* at 1123-24.

[71] *Id.* at 1124 (citing *Farnsworthon Contracts*, § 8.20 (1982)).

[72] *Id.* at 1125 (citing 11 *Williston on Contracts* § 1322 (3d ed. 1968)).

[73] *See also Darby Emerging Markets Fund, L.P. v. Ryan*, 2013 WL 6401131, at *11 (Del. Ch. Nov. 27, 2013) (concluding that the plaintiff stated a claim for anticipatory repudiation based on well-pled allegations that the defendants "positively and unconditionally repudiated their obligations" under the relevant contract).

perform a contract or its conditions entitling 'the other contracting party to treat the contract as rescinded.'"[74]

Initially, to the extent Plaintiffs assert that defendants repudiated the TRA by refusing to make Tax Benefit Payments that were due after a Change of Control, the Plaintiffs have failed to state a claim for lack of a valid premise: because the Amended Complaint fails to establish a breach of the TRA based on a Change of Control for the reasons explained above, Wentworth was under no obligation to make those payments yet. Additionally, in my opinion, none of the four statements alleged by Plaintiffs rises to the level, even under the reasonable conceivability standard, to state a claim for anticipatory repudiation under Delaware law.

First, Plaintiffs allege that defendant Miller told Veloric during a telephone call that he "believed the Bankruptcy extinguished all of the obligations under the TRA."[75] This was a statement of belief by Miller, a non-lawyer, about whether defendants' payment obligations still existed under the TRA in light of the 2009 bankruptcy. It is not reasonably conceivable that Miller's statement repudiated the TRA because he neither unequivocally nor unconditionally refused to perform.

Second, Plaintiffs allege that defendant Rodriguez told Veloric in a November 1, 2012 email (which was not attached to the Amended Complaint) that Wentworth "had no assets with which it could pay Veloric and Goodman, and that Defendants believed no

---

[74] *CitiSteel USA, Inc. v. Connell Ltd. P'ship*, 758 A.2d 928, 931 (Del. 2000) (citation omitted).

[75] Am. Compl. ¶ 137.

other Wentworth entity owed any obligation relating to the TRA." [76]  I also do not find it reasonably conceivable that this email was an unequivocal or unconditional statement of repudiation.  Rather, Rodriguez's email was nothing more than a mere "expression of doubt" about "the ability to perform . . . when the times comes, [which] is not a repudiation." [77]

Third, Plaintiffs allege certain defendants claimed that Wentworth "would not owe any payments under the TRA because it would not earn enough income to pay any taxes and thus receive tax benefits."[78]  This alleged statement is not a well-pled allegation for anticipatory repudiation for the same reason that Rodriguez's email was not.  It is little more than an expression of doubt.

Fourth, Plaintiffs allege that various defendants asserted that a loan from Holdco to Wentworth to pay Wentworth's obligations to Plaintiffs "would be impermissible because [Wentworth] is insolvent."[79]  This allegation fails for lack of a well-pled factual predicate.  The purpose of such a loan presumably would have been to pay Wentworth's potential obligation to Plaintiffs under the TRA but, as discussed above, the Amended Complaint fails to establish any current obligation of Wentworth to pay Plaintiffs.

---

[76] *Id.*

[77] *Elliott Assocs., L.P. v. Bio-Response, Inc.*, 1989 WL 55070, at *3 (Del. Ch. May 23, 1989) (quoting 4 *Corbin on Contracts* § 974 (1951)).

[78] Am. Compl. ¶ 137.

[79] *Id.*

Plaintiffs further allege that, on November 20, 2012, in response to letters sent to JLL Distribution and Wentworth on November 8 and November 16 stating that the rumored sale of Peachtree LLC would constitute a Change of Control under the TRA,[80] defendants' counsel responded that "there is not currently an obligation under any of these agreements to make payments to [Plaintiffs]."[81] To the extent Plaintiffs contend that defendants' counsel's letter constituted a repudiation of the TRA, I disagree. That letter stated in unambiguous language that defendants denied that the TRA "has been repudiated or otherwise breached."[82] In sum, this and the other alleged remarks by defendants discussed above are far from the type of unequivocal and unconditional statements that, even at the pleadings stage, are necessary to state a claim for anticipatory repudiation.

### E. Count II: Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiffs contend that Wentworth, Holdco, and JGW LLC breached the implied covenant of good faith and fair dealing in the TRA and the Holdco LLC Agreement due to their conduct surrounding the JGW Merger and, to a lesser extent, the Peach Merger. Specifically, they argue that, by inserting Peachtree LLC in the corporate structure

---

[80] *Id.* ¶¶ 140-41.

[81] *Id.* ¶ 142.

[82] Davis Trans. Aff. Ex. 1. Although this letter is not attached to the Amended Complaint, I may consider it at the motion to dismiss stage because it is referenced in Paragraph 142 of the Amended Complaint and therefore is integral to Plaintiffs' claims. *See In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69-70 (Del. 1995).

between Holdco and JGW LLC, defendants unreasonably left Wentworth without sufficient "access [to] funds to pay its obligations under the TRA."[83] Plaintiffs assert that this conduct constitutes a breach of the implied covenant with respect to the definition of a Change of Control in the TRA.[84]

The implied covenant of good faith and fair dealing "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."[85] The Delaware Supreme Court has explained repeatedly that the implied covenant may be implicated only in "limited circumstances"[86] to address "what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting."[87] "The implied covenant only applies to developments that could not be anticipated, not developments that the parties simply failed to consider[.]"[88]

Defendants argue, among other things, that the Peach Merger and JGW Merger do not implicate the implied covenant in the TRA because those transactions were

---

[83] Pls.' Ans. Br. 45.

[84] Am. Compl. ¶¶ 184, 188.

[85] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (internal quotation and citation omitted).

[86] *Blaustein v. Lord Baltimore Capital Corp.*, 84 A.3d 954, 959 (Del. 2014)

[87] *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418 (Del. 2013) (citation omitted), *overruled on other grounds by Winshall v. Viacom Int'l Inc.*, 76 A.3d 808 (Del. 2013).

[88] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

44

reasonably foreseeable when the parties agreed to the definition of Change of Control. I agree. It was foreseeable in August 2007 that the J.G. Wentworth companies might engage in a variety of merger or acquisition transactions that could affect Wentworth's tax liability. The parties to the TRA considered this issue, as evidenced by the TRA's thorough and detailed Change of Control definition, which covered a wide variety of transactions involving Wentworth and its subsidiaries. The fact that the parties considered this issue generally but declined to include specific transactions like the Peach Merger or the JGW Merger within the ambit of any Change of Control definition demonstrates that there is no "gap" in this provision of the TRA for the implied covenant of good faith and fair dealing to fill.

Plaintiffs allege that they did not make any changes to the Change of Control definition from the draft of the TRA that was provided to them. But that is not a well-pled allegation that they were not sophisticated parties who had no opportunity to negotiate that provision of the TRA. It is improper, under considerable Delaware Supreme Court authority, for Plaintiffs to rely upon the implied covenant to attempt to rewrite and expand the Change of Control definition to which they explicitly agreed to cover similar transactions.[89] Plaintiffs' allegations in Count II thus fail to state a claim for breach of the implied covenant of good faith and fair dealing.

Notably, moreover, neither the Peach Merger nor the JGW Merger is alleged to have affected the amounts of the payments that Plaintiffs may one day receive under the

---

[89] *See, e.g.*, *Blaustein*, 84 A.3d at 959; *Winshall*, 76 A.3d at 816; *Gerber*, 67 A.3d at 421; *Nemec*, 991 A.2d at 1126.

45

TRA after its tenth anniversary. In this respect, Plaintiffs' reliance on *American Capital Acquisition Partners, LLC v. LPL Holdings, Inc.*[90] is inapposite. In *American Capital*, the Court found allegations that the defendants actively sought to minimize revenue generated by a company (which had been purchased from the plaintiffs) stated a claim for breach of the implied covenant with respect to the plaintiffs' payment and compensation rights that were contingent on the company's post-acquisition revenue.[91] Here, by contrast, it is not alleged that the Peach Merger or the JGW Merger decreased the Tax Benefit Payments that Plaintiffs may receive at the end of the natural term of the TRA.[92]

---

[90] 2014 WL 354496 (Del. Ch. Feb. 3, 2014).

[91] *Id.* at *5.

[92] To the extent Plaintiffs argue that Wentworth's ability to pay them in the future has been improperly frustrated by the JGW Merger, I do not find this claim to be ripe for at least two reasons. First, Plaintiffs waived this issue by not briefing it in response to defendants' ripeness argument in their opening brief. *See Comac P'rs, L.P. v. Ghaznavi*, 793 A.2d 372, 378 (Del. Ch. 2001) ("[The defendant] did not respond to this aspect of the plaintiffs' argument, which I deem to be an admission of the correctness of the plaintiffs' position."). Second, even if the ripeness issue was not waived, there is no well-pled allegation that the JGW Merger has rendered Wentworth's performance under the TRA "apparently or actually impossible." *W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2009 WL 458779, at *5 (Del. Ch. Feb. 23, 2009). Rather, the reality that Wentworth's payment liability to Plaintiffs is contingent on future events persuades me that I should decline to decide whether the JGW Merger frustrated Wentworth's ability to pay Plaintiffs pursuant to the TRA until Wentworth's obligation to pay Plaintiffs actually arises. *See Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1239 (Del. Ch. 1987) ("To address a matter before the facts surrounding the dispute are fully developed necessarily not only increases the risk of an incorrect judgment in the particular case, but risks, as well, an inappropriate or unnecessary step in the incremental law building process itself.").

46

**E.    Count III: Breach of Contract against Holdco for Failing to Advance Funds to Wentworth**

Plaintiffs allege that Holdco breached its contractual obligation, under Section 4.2 of the Holdco LLC Agreement, to loan money to Wentworth to the extent that its distributions to Wentworth are insufficient to satisfy Wentworth's obligations under the TRA.[93]  Because Plaintiffs failed to state a claim that Wentworth is in breach of the TRA for failing to make payments to them (since there is no well-pled Change of Control alleged in the Amended Complaint), there was no contractual requirement that Holdco could have breached.  Thus, Count III is dismissed for failure to state a claim for breach of contract.

**F.    Count IV: Breach of Fiduciary Duty**

Plaintiffs assert a derivative breach of fiduciary duty claim against the Director Defendants as directors of Wentworth and against Fund V and JLL Distribution as the alleged controlling stockholders of Wentworth for their conduct relating to the acquisition of the operating assets of Peachtree Financial Solutions in 2011.  Plaintiffs purport to assert this claim as creditors of an allegedly insolvent Wentworth or, alternatively, as stockholders of Wentworth.[94]  Defendants moved to dismiss this claim under Rule 12(b)(6) for failure to state a claim and under Rule 23.1 for failure to make a demand on the Wentworth board or to plead demand futility with the requisite particularity.

---

[93] Am. Compl. ¶ 192.

[94] *Id.* ¶¶ 205-10.

Plaintiffs' fiduciary duty claim is not what one would expect a fiduciary duty claim to look like. Plaintiffs do not allege, for example, that the Director Defendants, Fund V, or JLL Distribution had any financial interest in the Peachtree businesses before the 2011 transaction or that the price paid to acquire those businesses was unfair. By all accounts, the 2011 mergers were part of an arms' length transaction with a third party.

Instead, Plaintiffs' theory of fiduciary liability is that these defendants acted "disloyally" by cutting "off Wentworth[], a corporation to which they are fiduciaries, from assets and funds, to the benefit of [Fund V and JLL Distribution]."[95] Coincidentally, as explained in their brief, "Plaintiffs have estimated the damages from the breach of duty as corresponding with the amounts owed to Plaintiffs under the TRA," *i.e.*, approximately $35 million.[96]

Plaintiffs spend considerable energy in their brief discussing, without effectively applying, Delaware case law that describes the type of allegations necessary to support distinct contract and fiduciary duty claims in similar situations. In my opinion, this case law does not govern here because Plaintiffs' claim for breach of fiduciary duty claim is simply a creative re-pleading of their contract claims asserted in Counts I and II.

---

[95] Pls.' Ans. Br. 50, 53 (citing *Am Gen. Hldgs. LLC v. Renco Gp., Inc.*, 2013 WL 5863010, at *10 (Del. Ch. Oct. 31, 2013); *PT China LLC v. PT Korea LLC*, 2010 WL 761145, at *7 (Del. Ch. Feb. 26, 2010); *Schuss v. Penfield P'rs, L.P.*, 2008 WL 2433842, at *10 (Del. Ch. June 13, 2008)).

[96] Pls. Ans. Br. 53 n. 15 (citing Am. Compl. ¶ 211).

Under the "well-settled principle" articulated by the Delaware Supreme Court in *Nemec v. Shrader*,[97] "where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim," and "any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous."[98] As explained by the Court in *Gale v. Bershad*,[99] to permit a fiduciary duty claim based entirely on a breach of contract to proceed alongside the primary contract claim "would undermine the primacy of contract law over fiduciary law in matters involving . . . contractual rights and obligations."[100]

This Court has applied this principle to dismiss duplicative fiduciary duty claims in a variety of contexts, such as those premised entirely on a breach of an LLC agreement[101] or on a breach of a preferred stock certificate of designation.[102] The same

---

[97] 991 A.2d 1120 (Del. 2010).

[98] *Id.* at 1129.

[99] 1998 WL 118022 (Del. Ch. Mar. 4, 1998).

[100] *Id.* at *5; *see also Grayson v. Imagination Station, Inc.*, 2010 WL 3221951, at *7 (Del. Ch. Aug. 16, 2010) (quoting *Gale*, 1998 WL 118022, at *5).

[101] *See, e.g.*, *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *11 (Del. Ch. May 7, 2008) ("Count III of Segal's counterclaims/third-party claims merely dresses his breach of contract claim in fiduciary duties' clothing. In support of these supposed fiduciary duty claims, Segal cites the same provisions of the Genitrix LLC Agreement that he cited in support of his breach of contract claims. These makeweight fiduciary duty claims fail[.]"), *aff'd*, 984 A.2d 124 (Del. 2009) (TABLE).

[102] *See, e.g.*, *Blue Chip Capital Fund II Ltd. P'ship v. Tubergen*, 906 A.2d 827, 834 (Del. Ch. 2006) ("Blue Chip's claimed right as a preferred stockholder to a larger distribution of the proceeds arises from contractual rights and obligations under the certificate of incorporation—a binding contract between the company and its preferred stockholders. . .

analysis, in my view, applies here to the breach of fiduciary duty claim because it is premised on exactly the same underlying facts and seeks the same remedy ($35 million) as Plaintiffs' contract claims. This is not a case in which, for example, Plaintiffs' fiduciary duty claim is based on "additional facts as well, [is] broader in scope, and involve[s] different considerations in terms of a potential remedy" than their contract claims.[103] Viewing the allegations of the Amended Complaint most favorably to Plaintiffs, it is not reasonably conceivable that the fiduciary duty claim arises independent of the contract claims. Thus, I dismiss Count IV as duplicative of Plaintiffs' claims in Counts I and II.[104]

### G. Count V: Aiding and Abetting

To state a claim for aiding and abetting under Delaware law, a plaintiff must allege, among other elements, a defendant's knowing participation in another's breach of fiduciary duty.[105] For the reasons set forth above, Plaintiffs have not adequately alleged a

---

. Accordingly, the court concludes that contract, and not fiduciary, principles should govern the analysis and dismisses the fiduciary duty claims against the directors.").

[103] *See Schuss*, 2008 WL 2433842, at *10; *see also PT China LLC*, 2010 WL 761145 (inferring at the motion to dismiss stage that allegations that the sole manager and member of a Delaware LLC "usurped business opportunities," used "confidential and proprietary information for his personal self-interest," and "misappropriated . . . resources for his own benefit" gave rise to a breach of fiduciary duty claim independent of a breach of contract claim with respect to a limited liability operating agreement and a joint venture agreement).

[104] Based on this conclusion, I need not address defendants' motion to dismiss Count IV for failure to comply with Rule 23.1.

[105] *See Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

breach of fiduciary duty in which any defendant could have knowingly participated. Accordingly, I dismiss Count V against Fund V, JLL Distribution, and Peachtree LLC for failure to state a claim.

### H.    Count VI: Unjust Enrichment

The Delaware Supreme Court has defined unjust enrichment as "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[106] To state a claim for unjust enrichment, which sounds in equity, a plaintiff must allege "the absence of a remedy provided by law," in addition to several other elements.[107] Thus, as Chancellor Chandler noted in *Kuroda v. SPJS Holdings, L.L.C.*,[108] this Court routinely dismisses unjust enrichment claims that are premised on an "express, enforceable contract that controls the parties' relationship" because damages is an available remedy at law for breach of contract.[109]

Here, the parties cannot legitimately dispute that the TRA is enforceable and that it governs Plaintiffs' requests for relief. To the extent Plaintiffs seek to enforce their rights to payment under the TRA, the proper theory of liability would be damages for breach of

---

[106] *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988).

[107] *See Nemec*, 991 A.2d at 1130.

[108] 971 A.2d 872 (Del. Ch. 2009)

[109] *See id.* at 891; *see also Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del. 1979) ("Because the contract is the measure of plaintiffs' right, there can be no recovery under an unjust enrichment theory independent of it.").

contract, not unjust enrichment. In other words, it is not reasonably conceivable that the Plaintiffs' unjust enrichment claim is "governed by fiduciary principles and not an enforceable contract."[110] I reach the same conclusion with respect to the unjust enrichment claim against JGW LLC and Peachtree LLC, even though neither was a party to the TRA, because a claim for unjust enrichment "cannot be used 'to circumvent basic contract principles [recognizing] that a person not a party to [a] contract cannot be held liable to it.'"[111] I therefore dismiss Count VI for failure to state a claim for unjust enrichment upon which relief may be granted.

## I.      Count VII: Declaratory Judgment

Plaintiffs seek a declaratory judgment that Fund V, JLL Distribution, Wentworth, Holdco, Peachtree LLC, and JGW LLC are jointly and severally liability to Plaintiffs for their damages.[112] This Court is authorized by statute to issue a declaratory judgment as to a party's "rights, status and other legal relations"[113] where there is an "actual controversy" between the parties.[114] However, Plaintiffs' declaratory judgment claim is not a distinct cause of action; it is a request for relief for Counts I-VI. Because I have concluded for the reasons explained above that Plaintiffs have failed to state a claim

---

[110] *Pfeiffer v. Leedle*, 2013 WL 5988416, at *10 (Del. Ch. Nov. 8, 2013).

[111] *Kuroda*, 971 A.2d at 891 (quoting *MetCap Sec. LLC v. Pearl Senior Care, Inc.*, 2007 WL 1498989, at *6 (Del. Ch. May 16, 2007)) (modifications in original).

[112] Am. Compl. ¶ 225.

[113] 10 Del. C. § 6501.

[114] *See Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 479-80 (Del. 1989).

under any of Counts I-VI, it necessarily follows that Plaintiffs have failed to plead a necessary element—any defendant's liability to them—in support of their claim for a declaratory judgment. Therefore, Count VII must be dismissed under Rule 12(b)(6).

## IV. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the Amended Complaint in its entirety under Court of Chancery Rule 12(b)(6) is GRANTED.

**IT IS SO ORDERED.**